# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, )<br>Lucyanne Okwomi, )<br> )<br>      Plaintiff, )<br> )<br>  vs. )<br> )<br>COMPLETE HEALTH CARE )<br>SERVICES, P.A., )<br> )<br>DR. SRINATH TADAKAMALLA, M.D., )<br> )<br>and )<br> )<br>DR. MALATHI TADAKAMALLA, M.D. )<br> )<br>      Defendants. ) | Case No. _____<br><br>**FILED IN CAMERA AND**<br>**UNDER SEAL**<br>**PURSUANT TO 31 U.S.C. § 3730(b)** |

## COMPLAINT

Plaintiff, the Relator, Lucyanne Okwomi, pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), files this Complaint against Complete Health Care Services, P.A. ("Complete Health Care"), Dr. Srinath Tadakamalla, M.D. and Dr. Malathi Tadakamalla, M.D. In support, Lucyanne Okwomi alleges as follows:

### I.  INTRODUCTION

1. Plaintiff and Relator, Lucyanne Okwomi ("Relator" or "Okwomi"), pursuant to the *qui tam* provisions of the FCA, files this Complaint against Defendants Complete Health Care, Dr. Srinath Tadakamalla and Dr. Malathi Tadakamalla.

2. Defendant Complete Health Care is a professional association with its headquarters listed at 5014 West 147th Street, Leawood, Kansas 66224.

3. Defendant Dr. Srinath Tadakamalla is a physician licensed to practice

medicine in Missouri and Kansas.  His national provider identifier ("NPI") number is 1184691305.

4.    Defendant Dr. Malathi Tadakamalla is a physician licensed to practice medicine in Missouri and Kansas.  Her national provider identifier ("NPI") number is 1316989197.

5.    Operating through Defendant Complete Health Care, Defendant Dr. Srinath Tadakamalla performs medical services and otherwise controls the billing to insurers for various medical services performed at several skilled nursing facilities ("SNFs") within this District.   Those SNFs include at least the following:  Rehabilitation Center of Independence; Edgewood Manor (in Raytown); Truman Gardens (in Independence); The Villages of Jackson Creek (in Independence); Carmel Hills Healthcare & Rehabilitation Center (in Independence); Shangri-La Rehabilitation & Living Center (in Blue Springs); Beautiful Savior (in Belton); John Knox Village (in Lee's Summit); The Groves (in Independence); Meadow View Health and Rehabilitation (in Harrisonville); Crown Care Center (in Harrisonville); and Golden Years Health Center (in Harrisonville).

6.    Operating through Defendant Complete Health Care, Defendant Dr. Malathi Tadakamalla performs medical services and otherwise controls the billing to insurers for various medical services performed at several nursing facilities ("NFs") within this District.

7.    During relevant times, the vast majority of the health care services billed under the name of Defendant Dr. Srinath Tadakamalla at SNFs were paid for by Medicare, and many of the health care services billed under the name of Dr. Malathi Tadakamalla at NFs were paid for by Medicaid.

8. From about October 3, 2016 through about January 18, 2017, Relator Okwomi was employed by Defendant Complete Health Care as a Nurse Practitioner.

9. As a Nurse Practitioner for Complete Health Care, Relator Okwomi's duties included providing skilled nursing services to patients at various SNFs at the direction of Defendant Dr. Srinath Tadakamalla. As a Nurse Practitioner for Complete Health Care, Relator Okwomi also became aware of the practices of Defendant Dr. Malathi Tadakamalla, as described herein.

10. As described herein, Defendants have routinely violated the FCA by filing, or causing to be filed, false submissions for reimbursements for services which were paid for by Government healthcare programs. As described herein, those false claims have included:

1) Filing claims for the initial comprehensive assessment of patients at SNFs under the name of Dr. Srinath Tadakamalla which were performed by Nurse Practitioners in violation of Medicare rules.

2) Filing claims for health care services at SNFs under the name of Dr. Srinath Tadakamalla which were performed by Nurse Practitioners in order to receive unlawfully increased Medicare reimbursements.

3) Filing claims paid by Medicare for health care services at SNFs for evaluation and management services that were either not performed or were medically unnecessary.

4) Filing claims for health care services at NFs under the name of Dr. Malathi Tadakamalla which were performed by Nurse Practitioners in order to receive unlawfully increased Medicaid reimbursements.

## II. JURISDICTION AND VENUE

11. Relator Okwomi brings this action on behalf of the United States of America for Defendants' violations of the FCA.

12. Subject matter jurisdiction over this federal FCA action exists in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

13. Personal jurisdiction over each of the Defendants exists in this Court because each of the Defendants transacts business in this District as described herein.

14. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because each of the Defendants transacts business in this District, as described herein.

15. This suit is not based upon prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in news media; or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. 3730(e)(4).

16. Even if there has been a public disclosure, Relator Okwomi is an original source under 31 U.S.C. § 3730(e)(4). Prior to any public disclosure, Relator Okwomi voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based. Relator Okwomi has knowledge that is independent of and materially adds to the allegations and transactions, including any publicly disclosed allegations and transactions. Relator Okwomi also has direct and independent knowledge of the information on which the allegations are based. Relator Okwomi voluntarily provided this information to the federal government before filing this action based on that information.

### III. PARTIES

17. Relator Okwomi is a resident of Kansas who, from about October 3, 2016 through about January 18, 2017 was employed by Complete Health Care as a Nurse Practitioner. After a 30-day orientation, she worked at several of the SNFs listed above.

18. Relator Okwomi's duties as a Nurse Practitioner at Complete Health Care consisted mostly of providing health care services to patients at SNFs. Many of those services were in the form of an initial comprehensive assessment of a patient and developing a plan of care for the patient, typically following a recent discharge from a hospital stay. Other services included those subsequent and stemming from the initial comprehensive assessment of a patient, such as reviewing medications, ordering laboratory tests, reviewing laboratory test results, and follow-up evaluation and management services.

19. While Relator Okwomi performed health care services to patients at SNFs as an employee of Complete Health Care, Dr. Srinath Tadakamalla routinely instructed Relator Okwomi to sign Dr. Srinath Tadakamalla's name, utilizing his electronic signature, to falsely indicate that Dr. Srinath Tadakamalla had performed SNF services that Relator Okwomi had performed. More specifically, in a typical five-day work week, Dr. Srinath Tadakamalla instructed Relator Okwomi to record such SNF services under his name on about three of those five days. Even on the days that Dr. Srinath Tadakamalla otherwise instructed Relator Okwomi generally to record such services she performed under her own name, he instructed her to record initial comprehensive assessments of patients at SNFs under Dr. Srinath Tadakamalla's name.

20. Dr. Srinath Tadakamalla similarly instructed other Nurse Practitioners employed by Complete Health Care to record SNF services they had provided under Dr.

Srinath Tadakamalla's name. In a typical work day, two or three Nurse Practitioners employed by Complete Health Care recorded their SNF services under Dr. Srinath Tadakamalla's name, pursuant to his instructions and demands to do so.

21. While Relator Okwomi was employed by Complete Health Care as a Nurse Practitioner, Dr. Srinath Tadakamalla informed Relator Okwomi that each Nurse Practitioner was required to meet a "quota" of providing services to at least 20 patients per day. That quota resulted in an ethical dilemma on days where the census of patients at the SNF to which she was assigned lacked a sufficient census of patients for whom skilled nursing services were medically necessary. On most days, towards the end of Relator Okwomi's shift (typically 5:00 p.m.) Relator Okwomi had not met the twenty-patient quota of services provided. On those days, if there was sufficient time left in her shift, Dr. Srinath Tadakamalla would instruct her to perform evaluation and management services to additional patients, regardless of whether such services were medically necessary. On most such occasions there was not sufficient time left in Relator Okwomi's shift to complete additional services to reach the twenty patient quota; on those days, Dr. Srinath Tadakamalla instructed Relator Okwomi to go home, and to enter additional services for patients via remote computer, despite Dr. Srinath Tadakamalla knowing that such services had not been performed by Relator Okwomi.

22. During the brief period of time that Relator Okwomi was employed by Complete Health Care, other Nurse Practitioners employed by Complete Health Care included Helen Lewis-Brown, Marcia Burris, Renee Endicott, Debbie Meyers, Laura Geissler, Hanna Lazenly and Alicia Chancey.

23. At least two of those Nurse Practitioners employed by Complete Health Care, Debbie Meyers and Alicia Chancey, performed work at NFs under the direction of

Dr. Malathi Tadakamalla. While Nurse Practitioners performed health care services to patients at NFs as employees of Complete Health Care, Dr. Malathi Tadakamalla routinely instructed them to sign her name, utilizing her electronic signature, to falsely indicate that Dr. Malathi Tadakamalla had performed NF services that the Nurse Practitioners had performed.

24. On most work days, there were at least two Nurse Practitioners employed by Complete Health Care who were instructed to record their SNF services under Dr. Srinath Tadakamalla's name, and at least two Nurse Practitioners employed by Complete Health Care who were instructed to record their NF services under Dr. Malathi Tadakamalla's name.

25. On several occasions, Dr. Srinath Tadakamalla explained to Relator Okwomi that the reason he instructed her to record services she had performed under his name was for insurance billing purposes. Moreover, Dr. Srinath Tadakamalla specifically explained to Relator Okwomi that he was careful to make sure that the number of services recorded under his name that would be billed to Medicare did not exceed 60 in any given day because, if the number of services ultimately billed to Medicare exceeded 60 in a given day, it would raise suspicions with Medicare.

26. On or about January 18, 2017, Relator Okwomi stated to Dr. Srinath Tadakamalla that she would no longer comply with his requests to record services that had not been provided and to record services under his name. She stated that she believed that complying with his demands to do so amounted to Medicare fraud, and she would not participate in such fraud.

27. In retaliation for Relator Okwomi's refusal to comply with Dr. Srinath Tadakamalla's demands to participate in Medicare fraud in the form of recording

services not performed and recording services performed by her under Dr. Srinath Tadakamalla's name, Dr. Srinath Tadakamalla terminated Relator Okwomi's employment with Complete Health Care in violation of both the anti-retaliation provisions of the FCA and Missouri common law.

28. The United States of America, through its agency, the Department of Health and Human Services ("HHS") and HHS's operating division, the Center for Medicare and Medicaid Services ("CMS"), administers the Medicare program to provide health insurance for the elderly and the disabled.

29. The State of Missouri, where the relevant SNFs and NFs are located, administers and provides some of the funding to the Medicaid program to provide health insurance to the indigent population of Missouri. The United States, however, provides much of the funding for the relevant Missouri Medicaid program from which Defendants have received reimbursements.

30. During relevant times, the United States, the real party in interest under the FCA, has paid, and/or funded the payment of, at least several hundred thousand dollars annually to Defendants, and in particular to Defendants Srinath Tadakamalla and Malathi Tadakamalla based on voluminous claims submitted under the Medicare and Medicaid programs.

31. More than 90 percent of the insurance reimbursement claims at issue for SNF services were submitted to various forms of Medicare, including traditional Medicare and federally-funded Medicare Advantage plans. As to SNF claims under the name of, or at the direction of, Dr. Srinath Tadakamalla, such claims were submitted under Medicare Part A, or under Medicare Part C to Medicare Advantage plans. Those Medicare Advantage plans included at least the following: United HealthCare—

Medicare Advantage; Aetna/Coventry—Medicare Advantage; Cigna HealthSpring—Medicare Advantage; and Blue Cross and Blue Shield—Medicare Advantage.

32. Under long-standing precedent, claims for reimbursements from Medicare Part A based on knowingly false statements are actionable under the FCA.

33. Pursuant to amendments to the FCA as part of the Fraud Enforcement and Recovery Act of 2009 ("FERA"), claims for reimbursements from Medicare Advantage plans (i.e. Medicare Part C) based on knowingly false statements are actionable under the FCA despite the "capitated" nature of CMS funding under Medicare Part C to Medicare Advantage insurance plans and the lack of presentment of such claims directly to the Government. *See United States ex rel. Garbe v. K-Mart Corp.,* 824 F.3d 632 (7th Cir. 2016).

34. Many of the insurance reimbursement claims at issue for NF services were submitted to Missouri Medicaid.

35. Under long-standing precedent, claims for reimbursements from Medicaid based on knowingly false statements are actionable under the FCA.

### IV. THE FALSE AND/OR FRAUDULENT CLAIMS

36. The insurance reimbursement claims of the Defendants at issue were prepared and submitted by an individual named Sami Khalil.

37. Khalil prepared those insurance reimbursement claims based on the false medical records as described herein.

**A. Medicare Claims for Initial Comprehensive Assessments of Patients At SNFs under Dr. Srinath Tadakamalla's Name Which Were Performed by Nurse Practitioners.**

38. Medicare regulations require that initial comprehensive assessments of patients at SNFs during which a physician completes a thorough assessment, develops a

plan of care and writes or verifies admitting orders for the patient must be performed by the physician and cannot be delegated to nurse practitioner. 42 C.F.R. § 483.40(c)(1), (c)(4) and (e); *see also* CMS Survey & Certification Memo 13-15 (March 8, 2013); CMS Survey & Certification Memo 04-08 (Nov. 13, 2003).

39. Thus, a condition of payment of a Medicare claim for the initial comprehensive assessment of a patient at a SNF is that a physician, rather than a nurse practitioner, performed the initial comprehensive assessment of the patient.

40. The relevant CPT Codes for initial comprehensive assessments of patients at a SNF are 99304, 99305 and 99306. As between those three CPT Codes, the appropriate Code depends upon the level of care involved in the initial comprehensive assessment. CPT Code 99304 is used if the services involved a detailed history and physical exam and medical decision making of low complexity; the typical time for such an assessment is 25 minutes. CPT Code 99305 is used if the services involved a comprehensive history and physical exam and medical decision making of moderate complexity; the typical time for such an assessment is 35 minutes. CPT Code 99306 is used if the services involved a comprehensive history and physical exam and medical decision making of high complexity; the typical time for such an assessment is 45 minutes.

41. Nonetheless, Dr. Srinath Tadakamalla routinely instructed Nurse Practitioners employed by Complete Health Care to perform such initial comprehensive assessments of patients at SNFs and instructed them to record such services by signing Dr. Srinath Tadakamalla's name, utilizing his electronic signature, to falsely indicate that Dr. Srinath Tadakamalla had performed such initial comprehensive assessments.

42. Claims for reimbursements for such initial comprehensive assessments of

10

patients at SNFs which falsely indicated that Dr. Srinath Tadakamalla had performed such services were submitted for payment to, and were paid by, Medicare Part A and Medicare Advantage plans.

43. For example, during first two weeks of January 2017, as instructed by Dr. Srinath Tadakamalla, Relator Okwomi performed initial comprehensive assessments of SNF patients at the Rehabilitation Center of Independence. As instructed by Dr. Srinath Tadakamalla, Relator Okwomi recorded Dr. Srinath Tadakamalla's electronic signature as the provider who performed such services. Claims for those initial comprehensive assessments were then submitted to and paid by Medicare based on the false information that Dr. Srinath Tadakamalla had performed those services. The patients and the relevant Medicare payors for such fraudulent submissions as to those initial comprehensive assessments on January 9, 2017 included, but were not limited to, the following:

| **Patient's Name** | **Medicare Payor** |
|---|---|
| K. O.[1] | United HealthCare—Medicare Advantage |
| R. J. | Medicare Part A |
| P. T. | Medicare Part A |
| R. P. | United HealthCare—Medicare Advantage |
| L. K. | United HealthCare—Medicare Advantage |
| D. A. | Aetna/Coventry—Medicare Advantage |
| J. L. | Cigna HealthSpring—Medicare Advantage |
| M. S. | Aetna/Coventry—Medicare Advantage |
| D. S. | Medicare Part A |
| L. B. | Aetna/Coventry—Medicare Advantage |

44. Dr. Srinath Tadakamalla did not perform the vast majority of SNF initial comprehensive assessments that were billed to Medicare under his name.

---

[1]In order to protect the confidential "Protected Health Information" ("PHI") as to these patients listed upon the unsealing of this Complaint, only the initials of these patients are provided in this Complaint. The first and last names of these patients are included in the Disclosure Statement that accompanies this Complaint and that has been provided to the Attorney General and the United States Attorney for the Western District of Missouri.

45. Further, as to the vast majority of SNF initial comprehensive assessments that were billed under Dr. Srinath Tadakamalla's name which were actually performed by Nurse Practitioners employed by Complete Health Care, Dr. Srinath Tadakamalla was not even at the relevant facility when the Nurse Practitioners performed such services.

46. As described herein, Medicare claims for reimbursements for initial comprehensive assessments of patients at SNFs that were based on false statements that Dr. Srinath Tadakamalla performed such services which were actually performed by Nurse Practitioners violated the FCA.

**B. Medicare Claims for Services Other than Initial Comprehensive Assessments of Patients at SNFs under Dr. Srinath Tadakamalla's Name Which Were Performed by Nurse Practitioners.**

47. Unlike the initial comprehensive assessment, Medicare regulations generally allow a physician to delegate other SNF services that would otherwise be performed by a physician to a Nurse Practitioner, provided that the Nurse Practitioner is licensed in the relevant State and such services are within the scope of practice of a Nurse Practitioner allowed by the relevant State. 42 C.F.R. § 483.40(c)(4).

48. Nonetheless, Medicare generally provides for reimbursement of such services performed by a Nurse Practitioner at 85 percent of the Medicare Physician Fee Schedule ("MPFS").

49. As stated above, in addition to billing Medicare for initial comprehensive assessments of SNF patients under Dr. Srinath Tadakamalla's name which were performed by Nurse Practitioners, Dr. Srinath Tadakamalla similarly required Nurse Practitioners to record other SNF services that they performed under his name. Those

12

services were typically in the form of reviewing medications, ordering laboratory tests, reviewing laboratory test results, and follow-up evaluation and management services.

50. As to the vast majority of SNF services that were billed under Dr. Srinath Tadakamalla's name which were actually performed by Nurse Practitioners employed by Complete Health Care, Dr. Srinath Tadakamalla was not even at the relevant facility when the Nurse Practitioners performed such services.

51. Claims for reimbursements for such services performed by Nurse Practitioners employed Complete Health Care to patients at SNFs which falsely indicated that Dr. Srinath Tadakamalla had performed such services were submitted for payment to, and were paid by, Medicare Part A and Medicare Advantage plans.

52. Based on the false statements that such services, which were actually performed by Nurse Practitioners, were performed by Dr. Srinath Tadakamalla, submissions for reimbursements were made to Medicare, and Medicare paid for such services at the full MPFS, rather than at 85 percent of the MPFS, in violation of the FCA.

**C. Medicare Claims for Services of Patients at SNFs Which Were Not Performed or Were Medically Unnecessary.**

53. As stated above, as to Nurse Practitioners employed by Complete Health Care performing SNF services, Dr. Srinath Tadakamalla imposed a quota of 20 billable services per work day.

54. That daily quota for Nurse Practitioners' SNF services imposed by Dr. Srinath Tadakamalla resulted in an ethical dilemma for Nurse Practitioners on days where the census of patients at the SNF to which the Nurse Practitioner was assigned lacked a sufficient census of patients for whom skilled nursing services were medically necessary and/or on days when it was not possible or practicable to complete 20 billable

services.

55. Medicare does not cover services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 13957(a)(1)(A); *see also* 42 C.F.R. § 411.15(k).

56. On days when a Nurse Practitioner was unable to complete 20 billable services due to low patient census, Dr. Srinath Tadakamalla would instruct the Nurse Practitioner to perform evaluation and management services to additional patients, despite the fact that such evaluation and management services were not medically necessary.

57. On days when there was not sufficient time during a Nurse Practitioner's shift to complete 20 SNF services, Dr. Srinath Tadakamalla instructed the Nurse Practitioner to record additional services as if they had been performed for patients, despite Dr. Srinath Tadakamalla knowing that such services had not been performed by the Nurse Practitioner.

58. Medicare claims were submitted for such medically unnecessary services and for such services that had not been performed, and Medicare paid for such services, in violation of the FCA.

**D.    Medicaid Claims for Services of Patients at NFs under Dr. Malathi Tadakamalla's Name Which Were Performed by Nurse Practitioners.**

59. Under Medicaid, a physician may delegate NF services that would otherwise be performed by a physician to a Nurse Practitioner, provided that the Nurse Practitioner is licensed in the relevant State and such services are within the scope of practice of a Nurse Practitioner allowed by the relevant State.

60. Nonetheless, Medicaid generally provides for reimbursement of such

services performed by a Nurse Practitioner at 85 percent of the rate of reimbursement for a physician for such services.

61. Dr. Malathi Tadakamalla required Nurse Practitioners employed by Complete Health Care to record NF services that they performed under her name.

62. Claims for reimbursements for such services performed by Nurse Practitioners employed Complete Health Care to patients at SNFs which falsely indicated that Dr. Srinath Tadakamalla had performed such services were submitted for payment to, and were paid by, Missouri Medicaid.

63. Based on the false statements that such services, which were actually performed by Nurse Practitioners, were performed by Dr. Malathi Tadakamalla, submissions for reimbursements were made to Missouri Medicaid, and Missouri Medicare paid for such services at the full physician rate, rather than at 85 percent of the physician rate, in violation of the FCA.

## V.    RETALIATION

63. From about October 3, 2016 through about January 18, 2017, Relator Okwomi was employed by Defendant Complete Health Care as a Nurse Practitioner. After a 30-day orientation, she worked at several of the SNFs listed herein.

64. As a Nurse Practitioner for Complete Health Care, Relator Okwomi's duties included providing skilled nursing services to patients at various SNFs at the direction of Defendant Dr. Srinath Tadakamalla.  As a Nurse Practitioner for Complete Health Care, Relator Okwomi also became aware of the practices of Defendant Dr. Malathi Tadakamalla, as described herein.

65. Relator Okwomi's duties as a Nurse Practitioner at Complete Health Care consisted mostly of providing health care services to patients at SNFs.  Many of those

services were in the form of an initial comprehensive assessment of a patient and developing a plan of care for the patient, typically following a recent discharge from a hospital stay. Other services included those subsequent and stemming from the initial comprehensive assessment of a patient, such as reviewing medications, ordering laboratory tests, reviewing laboratory test results, and follow-up evaluation and management services.

66.     As described herein, Dr. Srinath Tadakamalla effectuated false claims in violation of the FCA by, in part, instructing Nurse Practitioners employed by Complete Health Care, including Relator Okwomi, to falsely record that services by the Nurse Practitioner were performed by Dr. Srinath Tadakamalla and to falsely document services that had not been performed.

67.     On or about January 18, 2017, Relator Okwomi stated to Dr. Srinath Tadakamalla that she would no longer comply with his requests to record services that had not been provided and to record services that she had performed under his name. She stated that she believed that complying with his demands to do so amounted to Medicare fraud, and she would not participate in such fraud.

68.     In retaliation for Relator Okwomi's refusal to comply with Dr. Srinath Tadakamalla's demands to participate in Medicare fraud in the form of recording services not performed and recording services performed by her under Dr. Srinath Tadakamalla's name, Dr. Srinath Tadakamalla terminated Relator Okwomi's employment with Complete Health Care in violation of both the anti-retaliation provisions of the FCA and Missouri common law.

**COUNT ONE**
**FALSE CLAIMS ACTION VIOLATION PURSUANT TO**
**31 U.S.C. § 3729(a)(1)(A)**

69. Relator Okwomi realleges and incorporates by reference the allegations previously alleged herein.

70. Defendants undertook the actions relating to the conduct alleged above when their officers, agents, and employees authorized its various officers, agents, and employees to take the actions relating to the conduct alleged above.

71. By knowingly or recklessly presenting, or causing to be presented, claims for payment for services rendered to Medicare and Medicaid beneficiaries when Defendants knew, or absent recklessness should have known, that such claims were false, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States and/or the United States' contractors, grantees, or other recipients in violation of 31 U.S.C. § 3729(a)(1)(A).

72. Defendants "knowingly" violated the False Claims Act, as that term is defined in 31 U.S.C. § 3729(b)(1). As to each of the above allegations, Defendants acted with actual knowledge of falsity of the alleged information, in deliberate disregard of the truth or falsity of the alleged information, and/or in reckless disregard of the truth or falsity of the alleged information.

73. The United States, and/or relevant intermediaries as to Government-funded health care programs, unaware of the false or fraudulent nature of these claims, paid such claims when they would not otherwise have paid had the United States and/or the relevant intermediaries known the truth.

74. By knowingly violating 31 U.S.C. § 3729(a)(1)(A), Defendants damaged the United States and/or received, or caused the receipt, of reimbursements from Government-funded health care programs to which Defendants were not entitled.

**COUNT TWO**
**FALSE CLAIMS ACT VIOLATION PURSUANT TO**
**31 U.S.C. § 3729(a)(1)(B)**

75.     Relator Okwomi realleges and incorporates by reference the allegations previously alleged herein.

76.     Defendants undertook the actions relating to the conduct alleged above when their officers, agents, and employees authorized its various officers, members, agents, and employees to take the actions relating to the conduct alleged above.

77.     By filing, or causing the relevant claims to be filed for payments from Medicare and Medicaid, Defendants knowingly made or caused to be made a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

78.     Defendants "knowingly" violated the False Claims Act, as that term is defined in 31 U.S.C. § 3729(b)(1).  As to each of the above allegations, Defendants acted with actual knowledge of the falsity of the alleged information, in deliberate disregard of the truth or falsity of the alleged information, and/or in reckless disregard of the truth or falsity of the alleged information.

79.     The United States Government and/or the relevant intermediaries, unaware of the false or fraudulent nature of these claims, paid such claims when they would not otherwise have paid had they known the truth.

80.     By knowingly violating 31 U.S.C. § 3729(a)(1)(B), Defendants damaged the United States and/or fraudulently received, or caused the fraudulent receipt of, payments from Government-funded health care programs.

**COUNT THREE**
**REVERSE FALSE CLAIMS ACTION VIOLATION PURSUANT TO**
**31 U.S.C. § 3729(a)(1)(G)**

81. Relator Okwomi realleges and incorporates by reference the allegations previously alleged herein.

82. Defendants undertook the actions relating to the conduct alleged above when their officers, agents, and employees authorized their various officers, agents, and employees to take the actions relating to the conduct alleged above.

83. By failing to remediate or reconcile with the United States as it improperly received funds from Medicare and Medicaid, Defendants knowingly failed to pay or transmit money or property to the Government and knowingly concealed and/or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

84. By knowingly violating 31 U.S.C. § 3729(a)(1)(G), Defendants damaged the United States.

WHEREFORE, Relator Okwomi respectfully requests this Court to award the following relief to the following parties and against Defendants:

**To the United States:**

(1) Three times the amount of actual damages which the United States has sustained, or three times the amount of improperly received payments, as a result of the Defendants' conduct;

(2) A civil penalty of no less than $5,500 and up to $11,000 for each false claim which Defendants presented or caused to be presented to the United States;

(3) Prejudgment interest;

(4) All costs incurred in bringing this action; and

(5) Such further relief as this Court deems equitable and just.

**To Relator Okwomi:**

(1)     The maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**COUNT FOUR**
**FALSE CLAIMS ACT RETALIATION**
**IN VIOLATION OF 31 U.S.C. § 3730(h)**

85.     Relator Okwomi realleges and incorporates by reference the allegations previously alleged herein.

86.     Relator Okwomi was employed by Defendant Complete Health Care as a Nurse Practitioner from approximately October 3, 2016 through about January 18, 2017. During this period, Defendants controlled and had the right to control the manner and means by which Relator Okwomi's Nurse Practitioner services were performed, including but not limited to, the duration of the relationship between the parties, the method of payment of wages and other compensation, and the hours of work.

87.     Pursuant to the right to control and the exercise of control over Relator Okwomi, she and Defendant Complete Health Care had an employee/employer relationship as envisioned by the definition of that relationship under the FCA.

88.     In retaliation for Relator Okwomi's efforts to stop Defendant Complete Health Care knowing presentation of false claims and knowing use of false statements, Relator Okwomi's employment with Defendant Complete Health Care was terminated effective January 18, 2017.

89. In retaliation for Relator Okwomi's lawful actions in furtherance of an action pursuant to 31 U.S.C. § 3729, *et seq.*, Relator Okwomi's employment with Defendant Complete Health Care was terminated effective January 18, 2017.

90. As a direct and proximate result of this unlawful termination Relator Okwomi has suffered damages.

**WHEREFORE**, Relator Okwomi respectfully requests this Court to award the following relief to Relator Okwomi and against Defendant Complete Health Care:

(1) That, in accord with 31 U.S.C. § 3730(h)(2), Relator Okwomi be awarded reinstatement with the same seniority status she had at the time of his termination, 2 times the amount of back pay, interest on the back pay, and compensation for all special damages sustained as a result of her termination, which include, but are not limited to: damages associated with Relator Okwomi's efforts to obtain alternative employment, attorneys' fees, expenses, and litigation costs.

(2) Such further relief as this Court deems equitable and just.

### COUNT FIVE
### RETALIATION IN VIOLATION OF
### MISSOURI COMMON LAW

91. Relator Okwomi realleges and incorporates the above allegations as if fully set forth herein.

92. Defendant Complete Health Care's termination of Relator Okwomi, as described herein, was in violation of Missouri public policy, and therefore constituted a tortuous wrongful termination.

93. As a direct and proximate result of this unlawful termination in violation

of public policy, Relator Okwomi has suffered damages.

**WHEREFORE**, Relator Okwomi respectfully requests this Court to award the following relief to Relator Okwomi and against Defendant Complete Health Care:

1. That Relator Okwomi be afforded all damages resulting from her Missouri wrongful termination in violation of public policy tort claim, including all back pay, interest on back pay, compensation for all other economic, noneconomic, special, general, and compensatory damages, pain and suffering, punitive damages, and all damages sustained in an amount to be proved at trial along with prejudgment interest;

2. Such further relief that this Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of Federal Rules of Civil Procedure, Plaintiff/Relator hereby demands a trial by jury.

Respectfully submitted,

**BRADY & ASSOCIATES**

By: */s/Mark A. Kistler*
Mark A. Kistler, MO #48442
Michael F. Brady, MO #47521
10985 Cody Street, Ste. 135
Overland Park, KS 66210
(913) 696-0925
(913) 696-0468 *(Facsimile)*
mkistler@mbradylaw.com
brady@mbradylaw.com

**ATTORNEYS FOR PLAINTIFF/RELATOR**